## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **THOMAS A. SNITZER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 07 C 339 |
| | ) | |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendants' motion to dismiss. For the reasons stated below, we grant in part and deny in part Defendants' motion to dismiss.

## BACKGROUND

Plaintiff Thomas A. Snitzer ("Snitzer") alleges that he was a member of River Village I, L.L.C. ("RVI") and other development entities. Defendant Stan-Lee Kaderbek ("Kaderbek") was allegedly the Commissioner for the City of Chicago Department of Buildings from June 2004 to August 2005. Snitzer contends that through RVI, he planned to develop a large single-family home development known as Bridgeport Village-Phase I ("Bridgeport Village") in Defendant City of Chicago's

1

("City") Bridgeport neighborhood. Snitzer was allegedly the manager for the development of Bridgeport Village. The project began in 1998 and for one year the alderman for the Bridgeport neighborhood allegedly refused to discuss the processing of any zoning request because the Democratic party leadership in that area ("Leadership") allegedly did not want an "outsider" to control or profit in that area. (Compl Par. 32).

Snitzer claims he was approached by Defendant Timothy Degnan ("Degnan") who is allegedly a main player in the Leadership. Degnan allegedly told John Kinsella ("Kinsella"), Snitzer's partner, that in order to secure the zoning approval for Bridgeport Village, Degnan's lieutenant, Thomas Dipiazza ("Dipiazza"), needed to be admitted to the development venture as a partner.

Snitzer claims that he initially refused to admit Dipiazza to the venture, but later agreed to retain Dipiazza as a real estate consultant for Bridgeport Village and other development projects in the Bridgeport neighborhood. According to Snitzer, the City approval process for Bridgeport Village then proceeded until the relationship among Snitzer and Dipiazza and Degnan deteriorated due to Snitzer's refusal to accede to their demands. Snitzer alleges that Degnan and Dipiazza made a series of demands for exorbitant fees, as well for preferential treatment in the purchase of homes in Bridgeport Village for associates of Degnan. Degnan also allegedly instructed Snitzer not to pursue the purchase of certain property because a predesignated individual associated with Degnan was supposed to win the bid for the property. Degnan and Dipiazza allegedly repeatedly threatened Snitzer that if he did

not acquiesce to their demands they would use their alleged control over City officials to ensure that the development approval process for Bridgeport Village did not run smoothly.

From 2002 to 2004, the Bridgeport Village construction allegedly proceeded until Snitzer's disregard of the demands of Degnan and Dipiazza caused a complete breakdown in their relationship. Snitzer claims that despite Degnan's alleged instructions and threats, Snitzer bought certain property in March 2003. Also, in January 2005, Snitzer allegedly had a final fight with Degnan and Snitzer terminated Dipiazza's consulting contract.

Snitzer contends that after that point, Degnan used his influence with the City to inhibit the progress of the continuing development of Bridgeport Village. In November 2004 and January 2005, Snitzer claims the City Department of Buildings issued stop work orders for Bridgeport Village without justification. Kaderbek also allegedly refused to meet to discuss resolving the problems in order to delay the resumption of work on Bridgeport Village, which would result in the exposure of the unfinished houses to the winter weather. According to Snitzer, Kaderbek also threatened the project manager and the architect for Bridgeport Village because they were working for Snitzer. In addition, Kaderbek allegedly filed a false report about the architect with an architectural licensing board. Kaderbek also allegedly required unnecessary work to protect the homes from high winds and continued to refuse to meet with Bridgeport Village representatives to address problems.

Snitzer claims that Kaderbek also made statements to the public in order to

discredit Snitzer by indicating that Snitzer was an incompetent developer and creating unwarranted fear among the Bridgeport Village residents. Kaderbek also allegedly attempted to interfere with the financing for Bridgeport Village. The culmination of Kaderbek's alleged attacks on Snitzer's character came at a public meeting on March 10, 2005, at which Kaderbek allegedly made false statements about Snitzer, criticized and threatened Snitzer, and encouraged Bridgeport Village residents to bring a class action suit against Snitzer. Snitzer claims that, afterwards, his partners in the Bridgeport Village venture brought an action in state court ("State Action") seeking to oust Snitzer as the venture manager based upon concerns about Snitzer's competence. Snitzer contends that Kaderbek and other City officials influenced Snitzer's partners in their decision to bring the State Action against Snitzer and that Kaderbek and the other officials even attended the court hearings in the State Action. The state court allegedly entered a temporary restraining order removing Snitzer from the manager position at Bridgeport Village in June 2005. Snitzer claims that once he was removed from the manager position, Kaderbek and the City suddenly became more lenient in the dealings with the Bridgeport Village project.

Snitzer brought the instant action and includes in his complaint a claim alleging a deprivation of his First Amendment rights in violation of 42 U.S.C. § 1983 ("Section 1983") (Count I), a Section 1983 procedural due process claim (Count II), a substantive due process claim (Count III), an equal protection claim (Count IV), a conspiracy claim alleging a violation of 42 U.S.C. § 1985(3) ("Section 1985(3)")

(Count V), a claim alleging a violation of 42 U.S.C. § 1962(c) of the federal

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961

*et seq.* (Count VI), a claim alleging a violation of 42 U.S.C. § 1962(d) of RICO

(Count VII), and a civil conspiracy claim (Count VIII).  Defendants move to dismiss

all claims.


## LEGAL STANDARD

In ruling on a motion to dismiss, brought pursuant to Federal Rule of Civil

Procedure 12(b)(6), the court must draw all reasonable inferences that favor the

plaintiff, construe the allegations of the complaint in the light most favorable to the

plaintiff, and accept as true all well-pleaded facts and allegations in the complaint.

*Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002);

*Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991).  In order to withstand a

motion to dismiss, a complaint must allege the "operative facts" upon which each

claim is based.  *Kyle v. Morton High Sch.*, 144 F.3d 448, 454-55 (7th Cir. 1998);

*Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir. 1992).  A plaintiff is required to

include allegations in the complaint that "plausibly suggest that the plaintiff has a

right to relief, raising that possibility above a 'speculative level'" and "if they do not,

the plaintiff pleads itself out of court.'"  *E.E.O.C. v. Concentra Health Servs., Inc.*,

2007 WL 2215764, at *2 (7th Cir. 2007)(quoting in part *Bell Atlantic Corp. v.*

*Twombly,* 127 S.Ct. 1955, 1964 (2007)).  Under current notice pleading standard in

federal courts a plaintiff need not "plead facts that, if true, establish each element of a

'cause of action. . . .'" *See Sanjuan v. Amer. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)(stating that a "[a]t this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint" and that "[m]atching facts against legal elements comes later."). The plaintiff need not allege all of the facts involved in the claim and can plead conclusions. *Higgs v. Carter*, 286 F.3d 437, 439 (7th Cir. 2002); *Kyle*, 144 F.3d at 455. However, any conclusions pled must "provide the defendant with at least minimal notice of the claim," *Id.*, and the plaintiff cannot satisfy federal pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the bases of [his] claims." *Perkins*, 939 F.2d at 466-67. The Seventh Circuit has explained that "[o]ne pleads a 'claim for relief' by briefly describing the events." *Sanjuan*, 40 F.3d at 251; *Nance v. Vieregge*, 147 F.3d 589, 590 (7th Cir. 1998)(stating that "[p]laintiffs need not plead facts or legal theories; it is enough to set out a claim for relief").

**DISCUSSION**

I. Standing

Defendants argue that Snitzer lacks standing to pursue his claims in the instant action since Snitzer is seeking a remedy for an injury to the companies that he owned. In general, a party only has standing to bring a claim if the party can establish "an injury in fact; a causal link between the injury and the challenged action; and redressability through a favorable court decision." *Texas Indep.*

6

*Producers and Royalty Owners Assoc. v. E.P.A.*, 410 F.3d 964, 971 (7th Cir. 2005).

Defendants cite *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774 (7th Cir. 1994), which focused specifically on the context of corporate injuries and stated that "[s]hareholders do not have standing to sue for harms to the corporation, or even for the derivative harm to themselves that might arise from a tort or other wrong to the corporation." *Id.* at 777. However, Snitzer is not seeking to bring an action on behalf of the corporations he owned. Snitzer points out that he is not seeking lost profits or income from Bridgeport Village. Snitzer also specifically alleges in the complaint that he "seeks compensatory and punitive damages and injunctive relief" and that he "does not seek relief for injuries done to the project venture entities." (Compl. Par. 15). Snitzer alleges specific injuries to himself in the complaint. Snitzer claims, for example, that Kaderbek, "engaged in numerous communications with the press and with Bridgeport Village residents in a manner that incited fear and publicly portrayed Snitzer as an incompetent developer." (Compl. Par. 122). Snitzer also contends more than that Defendants generally harmed the development of Bridgeport Village. Defendants' alleged conduct allegedly resulted in Snitzer eventually being removed from the manager position by a court. (Compl. Par. 147). Snitzer makes clear in his answer to Defendants' motion to dismiss that he is seeking compensation for the damage to his reputation, his future ability to practice in his chosen profession, and harm caused to him in the form of pain, stress, and humiliation. (Ans. 6). Such allegations resulting in alleged injuries are sufficient to show standing. Thus, Snitzer has standing to pursue his claims in the instant action.

However, Snitzer, having taken this position, will not be allowed to change his position as this action progresses and should this case proceed to trial, the jury will be properly instructed as to the limited scope of the damages sought by Snitzer.

II.  Municipal Liability Claim

The City argues that Snitzer has failed to plead facts to state a municipal liability claim against the City.  Government employees are generally liable for their own misconduct and, thus, "'units of local government are responsible only for their policies rather than misconduct by their workers.'"  *Lewis v. City of Chicago*, 2007 WL 2128308, at *9 (7th Cir. 2007)(quoting *Fairley v. Fermaint,* 482 F.3d 897, 904 (7th Cir. 2007), and stating that a governmental entity cannot be held liable under Section 1983 under the doctrine of respondeat superior or vicarious liability).  To hold a government entity liable under Section 1983, a plaintiff must establish: "'(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the final force of law; or (3) [allege] that the constitutional injury was caused by a person with final policymaking authority.'"  *Lewis*, 2007 WL 2128308, at *9 (quoting *Roach v. City of Evansville,* 111 F.3d 544, 548 (7th Cir. 1997)).

The City argues that the City could not have a policy or custom that violates the First Amendment since a consent decree was entered in a prior case prohibiting any policies that violated the First Amendment.  However, the mere fact that a

consent decree is in place does not mean that the City may not have made policies that are contrary to the decree. Thus, the consent decree itself does not shield the City from any allegations that it may have policies that violate the First Amendment or that a constitutional injury was caused by a person with final policymaking authority.

The City also contends that Kaderbek was not a policymaker for the City. *See Lewis*, 2007 WL 2128308, at *9 (stating that "'[o]nly those individuals with the requisite policymaking authority are capable of establishing official policy as required by *Monell*'")(quoting *Chortek v. City of Milwaukee*, 356 F.3d 740, 748-49 (7th Cir. 2004)); *Alexander v. City of Milwaukee*, 474 F.3d 437, 448 (7th Cir. 2007)(stating that "[l]iability may be found either with a widely-adopted policy, or for even the single actions of municipal employees, if those employees had final policy making authority for the municipality, a question of state law"). Snitzer contends that Kaderbek, acting in his capacity as the Commissioner for the City of Chicago Department of Buildings, caused the harm to Snitzer. Snitzer alleges in the complaint that "[a]s head of the Department, Kaderbek had virtually complete, unfettered and ultimately standardless and arbitrary discretion over whether to shut a project down and whether to keep it shut down." (Compl. Par. 87). Snitzer also specifically alleges that Kaderbek "had final policymaking authority for the City." (Compl. Par. 155). The City points to provisions of the City Building Code that the City contends limits Kaderbek in his decisions and the City contends that Kaderbek was not a policymaker. However, the City Building Code does not conclusively

establish that Kaderbek was not a policymaker. The City Building Code is merely one piece of evidence to consider in assessing whether Kaderbek was a policymaker. Snitzer quotes portions of the City Building Code that indicate that Kaderbek was authorized to "establish a compliance procedure" and "any other necessary rules and regulations as may be required," (Ans. Supp. 4), and Snitzer contends that the City Building Code also delegated to Kaderbek policymaking authority. Snitzer contends that Kaderbek was given broad discretion and that he, in fact, created policies for the City. Although the City disagrees with Snitzer's contention that Kaderbek was a policymaker for the City, for the purposes of a motion to dismiss, we have not been presented with evidence at this stage of the proceedings that shows whether or not Kaderbek was a policymaker and thus the City's arguments are premature at this juncture. *Lewis*, 2007 WL 2128308, at *9 (affirming district court's ruling at the summary judgment stage and noting that the plaintiff did not "provide any evidence to demonstrate that [a defendant] ha[d] policy making authority"). Therefore, we deny the City's motion to dismiss the municipal liability claim.


III.  Qualified Immunity of Kaderbek

Defendants argue that we should dismiss the claims brought against Kaderbek since he is protected by qualified immunity. A governmental official is provided with qualified immunity when performing discretionary functions when his "conduct 'does not violate clearly established statutory or constitutional rights of which a

10

reasonable person would have known.'" *Pearson v. Welborn*, 471 F.3d 732, 741-42 (7th Cir. 2006)(quoting in part *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Defendants argue that Snitzer has not shown that there was a clearly established constitutional right at the time of Kaderbek's alleged misconduct. We disagree. For the purposes of the motion to dismiss, we must accept the allegations included in the complaint as true. *Thompson*, 300 F.3d at 753. Under the facts of the complaint, a government official such as Kaderbek that uses his official authority to harm the interest of a private citizen, for no reason other than to satisfy the desires of an associate for revenge against that citizen, should be aware that he was violating the law and the citizen's constitutional rights. As will be explained further below, based on the facts included in the complaint, Snitzer has stated certain constitutionally-based claims. We note that we are merely at the motion to dismiss stage and are ruling based upon the allegations in the complaint, which we must accept as true, and that Defendants are not precluded from raising the qualified immunity defense again at the summary judgment stage. Therefore, we conclude that, at this juncture, there is not sufficient evidence to show that Kaderbek is entitled to qualified immunity, and we deny the motion to dismiss that is based on qualified immunity.


IV. First Amendment Claim (Count I)

Defendants move to dismiss the First Amendment claim (Count I). The First Amendment provides that "Congress shall make no law respecting an establishment

of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I. Snitzer attempts to compare this case to the cases in *O'Hare Truck Servs., Inc. v. City of Northlake*, 518 U.S. 712 (1996), and *Roger Whitmore'Auto. Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659 (7th Cir. 2005). However, in those cases the plaintiffs were allegedly retaliated against by local government officials because the plaintiffs supported the opponents of the officials during elections. *O'Hare Truck Serv., Inc.*, 518 U.S. at 715*; Roger Whitmore's Auto. Servs., Inc.*, 424 F.3d at 664-65. There are no such allegations in the instant action that tie the alleged misconduct by government officials to retaliation against Snitzer for his political speech, his political views, or his lack of support for a political party. Although Snitzer indicates that Degnan and Dipiazza were connected to a particular political party, there are no allegations in the complaint that tie the alleged demands by Degnan and Dipiazza to Snitzer's support or opposition to that political party. Snitzer does not allege that any of the monies or other benefits that he provided to Degnan and Dipiazza were ever used in turn to support a political party. Rather, according to Snitzer's own allegations, Degnan and Dipiazza were allegedly attempting to obtain benefits for themselves and their associates. The allegations that Degnan and Dipiazza were tied to a political organization merely provides background facts that explain how Degnan and Dipiazza might have been associated with officials such as Kaderbek and how they might have allegedly had some influence over the officials. Thus,

Snitzer has failed to include allegations in his complaint that tie the alleged retaliation against him to his First Amendment right to free speech.

Snitzer contends that he intended to base his First Amendment claim on his constitutional freedom to associate, citing *Roberts v. United States Jaycees,* 468 U.S. 609 (1984). (Ans. 8). The United States Supreme Court has repeatedly "recognized the constitutional stature of the freedom to enter into and carry on certain intimate associations." *Christensen v. County of Boone, Ill.*, 483 F.3d 454, 462 (7th Cir. 2007)(explaining the holding in *Roberts*). The right to associate has been connected to "'a right to associate for the purpose of engaging in those activities protected by the First Amendment-speech, assembly, petition for the redress of grievances, and the exercise of religion,'" and to "'choices to enter into and maintain certain intimate human relationships. . . .'" *Id.* (quoting *Roberts,* 468 U.S. at 617-18).

In the instant action, Snitzer has not alleged any facts that show that any First Amendment activities relating to his speech, assembly, or other protected interests were impeded. Nor has Snitzer alleged facts showing that his ability to form intimate relationships has been affected. Snitzer alleges that he had a business relationship with Degnan and Dipiazza and that the relationship deteriorated, which resulted in problems with the development of Bridgeport Village. The allegations in Snitzer's complaint allege that Degnan and Dipiazza attempted to extort benefits from Snitzer for themselves and their associates. Degnan and Dipiazza then allegedly utilized contacts they had with government officials to obtain retribution against Snitzer for

refusing to include Degnan and Dipiazza in a business deal.  Such allegations do not raise First Amendment concerns.  *See Swank v. Smart*, 898 F.2d 1247, 1250 (7th Cir. 1990)(stating that the association at issue was "association in the literal sense, but not association 'for the advancement of beliefs and ideas'")(quoting in part *NAACP v. Ala.,* 357 U.S. 449, 460 (1958)); *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)(stating that the Court does "not think the Constitution recognizes a generalized right of 'social association'").

Snitzer argues that he was involved in a "coerced political relationship" and that his allegations "have a political dimension."  (Ans. 9).  However, the facts provided in the complaint do not support such a conclusion.  The mere fact that Degnan and Dipiazza were involved in a political party does not mean that this case involves a political relationship.  Snitzer has not alleged that Degnan or Dipiazza in any way sought to further the interests of their party or to punish Snitzer for a lack of support for the party.  Rather Snitzer contends that Degnan and Dipiazza sought personal gain for themselves and their associates.  Snitzer specifically alleges that the final break with Degnan occurred when Snitzer refused to accede to Degnan's demands to stay clear of deals in order to allow Degnan's associates to profit and when Snitzer terminated Dipiazza as a consultant and cut off Dipiazza's salary.  It was for such reasons, according to Snitzer, that Degnan allegedly used his influence with government officials to seek retribution against Snitzer.  Thus, Snitzer has failed to include allegations in his complaint that show that his First Amendment rights

were affected by Defendants' alleged misconduct and we grant Defendants' motion to dismiss the First Amendment claim (Count I).

## V.  Procedural Due Process Claim (Count II)

Defendants move to dismiss the procedural due process claim.  For a procedural due process claim, a plaintiff must establish: "1) that he had a property interest and 2) that he was deprived of this interest without due process of law." *Krieg v. Seybold*, 481 F.3d 512, 519 (7th Cir. 2007).  The plaintiff bears the burden of establishing that his alleged interest is an interest "arising out of a state statute, state or municipal regulations, or a contract with a public entity."  *Id.*

### A.  Property Interest

Defendants argue that Snitzer has not shown that he had a property interest, citing *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005).  (Mot. 13-14).  In *Dupuy* the court stated that "an individual has no cognizable liberty interest in his reputation; consequently, when a state actor makes allegations that merely damage a person's reputation, no federally protected liberty interest has been implicated."  *Id.* The Court in *Dupuy* indicated that a plaintiff would need to show that the reputation of the plaintiff was damaged to the extent that it was "'virtually impossible for the [individual] to find new employment in his chosen field. . . .'" *Id.* (quoting in part *Townsend v. Vallas,* 256 F.3d 661, 669 (7th Cir. 2001)).

Defendants argue that Snitzer has failed to allege that it is virtually impossible for him to find new employment and that the loss of one development is not sufficient to support a due process claim. However, such an analysis would delve into facts beyond the allegations in the complaint. Snitzer alleges in the complaint that he was a developer that worked in the Chicago area. Snitzer also alleges that Bridgeport Development was the City's largest development of single-family detached homes and that the development received various awards from the media. (Compl. Par. 2). Snitzer also alleges that Kaderbek made statements to the public, media, and at a public hearing that indicated that Snitzer was not competent in his role as a developer. According to Snitzer, his reputation was eventually tarnished to such an extent that he was removed from the manager position with the high profile development. Such facts do not conclusively establish whether or not it was virtually impossible for Snitzer to obtain future employment as a developer. Defendants contend that "there is no reason to believe that, even as alleged, any restriction on Snitzer's employment would go beyond the 11th Ward." (Reply 6). However, it is possible with such a high-profile development such as Bridgeport Development in the City and the public controversy surrounding Snitzer's difficulties that Snitzer's employment opportunities beyond the 11th Ward could have been affected. It is suggested by such allegations that the statements by Kaderbek and Defendants' efforts to allegedly remove Snitzer from the manager position had a substantial impact on Snitzer's reputation and his ability to obtain future employment as a developer. However, we cannot at the motion to dismiss stage engage in a review of

the evidence to make such a determination. This fact is clear from Defendants' own citations. Defendants contend, for example, that "Snitzer has no answer to *Long Grove Country Club Estates, Inc. v. Village of Long Grove*, 693 F.Supp. 640, 662 (N.D. Ill. 1988)." (Reply 6). However, in *Long Grove*, the district court ruled concerning a motion for summary judgment, not a motion to dismiss. *Id.* at 645. Whether Snitzer's reputation was damaged to such an extent as to provide a basis for a procedural due process claim cannot be decided at this juncture based solely upon the allegations in the complaint.

### B. Deprivation of Interest Without Due Process

Defendants also argue that Snitzer has not shown that he was deprived of an interest without due process of law. Defendants argue that Snitzer had adequate post-deprivation remedies. Defendants argue that Snitzer could have brought a state-law mandamus action in state court to challenge the stop work orders. Defendants also argue that Snitzer had other remedies available to him, such as petitioning the City's Building Board of Appeals. However, the failure to exhaust administrative remedies is an affirmative defense. *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006). Although a plaintiff might include allegations in a complaint that negate the possibility that the plaintiff could defeat the defense, a plaintiff has "no obligation to allege facts negating an affirmative defense in h[is]

complaint. . . ." *Id.* (stating that there was "nothing on the face of [the] complaint that compels a conclusion that [the plaintiff] failed to exhaust").  Nothing in the complaint before us conclusively resolves whether Snitzer exhausted all of his available administrative remedies.  An analysis as to what steps Snitzer took prior to filing the instant action would reach beyond the allegations in the complaint and would thus be premature at this juncture.  Such arguments are more properly addressed at the summary judgment stage.  Thus, since it is premature to determine the effect of Defendants' alleged actions on Snitzer's future employment or to determine whether Snitzer properly exhausted his administrative remedies, we deny Defendants' motion to dismiss the procedural due process claim in Count II as to Kaderbek and the City (Count II).  Although Snitzer alleges in Count II that Degnan and Dipiazza acted under color of state law, there are no facts in the complaint that would suggest that Degnan or Dipiazza acted under color of state law.  Therefore, we grant Defendants' motion to dismiss the claims brought against Degnan and Dipiazza in Count II.

VI.  Substantive Due Process Claim (Count III)

Defendants move for summary judgment on the substantive due process claim (Count III).  For a substantive due process claim, a plaintiff must establish the impairment of a fundamental right, meaning a right that "is so deeply rooted and sacrosanct that no amount of process would justify its deprivation." *Christensen*,

483 F.3d at 462.  If a fundamental right is identified by the plaintiff, then the plaintiff must show that "the government has interfered 'directly' and 'substantially' with the plaintiffs' exercise of that right."  *Id.* (quoting in part *Zablocki v. Redhail,* 434 U.S. 374, 386 (1978)).  If the plaintiff establishes the direct and substantial impairment of a fundamental right, the court must determine "whether the governmental action can find 'reasonable justification in the service of a legitimate governmental objective,' or if instead it more properly is 'characterized as arbitrary, or conscience shocking, in a constitutional sense.'"  *Id.* (quoting in part *County of Sacramento v. Lewis*, 523 U.S. 833, 833 (1998)).

Defendants argue that Snitzer has not identified a fundamental right that has been allegedly impaired by Defendants.  Snitzer responds vaguely that he "has alleged that he was deprived of various fundamental rights," (Ans. 20), but Snitzer fails to specify what rights he is referring to in his statement.  Snitzer mentions in the next sentence in his answer that he was deprived of his First Amendment right to association and "his occupational liberty."  (Ans. 20).  However, as is explained above, Snitzer has failed to state a First Amendment claim.  In regard to Snitzer's reference to his "occupational liberty," the Seventh Circuit has explicitly held that "[o]ccupational liberty . . . is not protected by substantive due process" and that "any cause of action for the deprivation of occupational liberty would be confined to a claim under procedural due process. . . ."  *Zorzi v. County of Putnam*, 30 F.3d 885, 895 (7th Cir. 1994)(stating in regard to occupational liberty that "there is no such

cause of action under substantive due process"). Thus, Snitzer has failed to allege sufficient facts that indicate that Defendants impaired one of his fundamental rights. Therefore, we grant Defendants' motion to dismiss the substantive due process claim (Count III).

## VII.  Equal Protection Claim (Count IV)

Defendants seek to dismiss the equal protection claim (Count IV).  Snitzer indicates that he intends to pursue a "class of one" equal protection claim.  (Ans. 20). For a "class of one" equal protection claim, a plaintiff must establish that "the State, without rational reason, treated it differently from other similarly situated entities." *RJB Properties, Inc. v. Bd. of Educ. of City of Chicago*, 468 F.3d 1005, 1009-1010 (7th Cir. 2006)(stating that "[t]he Court has noted that a 'class of one' equal protection claim may also require a plaintiff to prove one additional element: that the State acted with an illegitimate animus").

The only argument provided by Defendants is that Snitzer will not be able to point to a similarly situated entity. Defendants argue that Snitzer has pled himself out of court by alleging that Bridgeport Village was the largest single-family development in the City.  Defendants contend that due to the extraordinary nature of the development, it will be impossible for Snitzer to point to a similarly situated entity.  However, we do not agree with Defendants' contention that the mere fact that Bridgeport Village was the largest single-family development in the City is to be

interpreted as that "no similarly situated persons could possibly exist." (Mot. 22). Defendants point out that under the law Snitzer "bears a 'very significant burden' of offering evidence that other entities are similarly situated in all relevant respects." *RJB Properties, Inc.*, 468 F.3d at 1010 (quoting in part *Discovery House, Inc. v. Consolidated City of Indianapolis,* 319 F.3d 277, 283 (7th Cir. 2003)). However, at the motion to dismiss stage, Snitzer does not bear any burden of proof. In *RJB Properties, Inc.*, which is cited by Defendants, the court was examining whether the plaintiff had pointed to sufficient evidence to defeat the defendant's motion for summary judgment. *Id.* at 1006-07. Defendants also acknowledge that in determining whether another entity is similarly situated, a court must consider a list of factors, such as whether the entities were involved in the same type of project. (Mot. 23). Such a comparison can only be made at the summary judgment stage when the court is presented with evidence concerning other potential similarly situated entities. Thus, Defendants' arguments concerning whether it will be possible for Snitzer to point to similarly situated entities are premature. Defendants' own citations to controlling authority regarding equal protection claims, such as *Bell v. Duperrault*, 367 F.3d 703, 705 (7th Cir. 2004), address district courts' rulings on parties' motions for summary judgment, not motions to dismiss. *Id.* at 705; (Reply 13).

In support of his equal protection claim, Snitzer alleges in his complaint that Kaderbek, acting on behalf of the City, treated him differently than others. Snitzer

also alleges that Kaderbek acted in order to further his associates' desire for personal revenge, rather than in furtherance of a governmental interest and such actions, if true, could be deemed to be without a rational reason. Therefore, we deny Defendants' motion to dismiss the equal protection claim in Count IV as to Kaderbek and the City (Count IV). Although Snitzer alleges in Count IV that Degnan and Dipiazza acted under color of state law, there are no facts in the complaint that would suggest that Degnan or Dipiazza acted under color of state law. Therefore, we grant Defendants' motion to dismiss the claims brought against Degnan and Dipiazza in Count IV.

## VIII. Section 1985(3) Claim (Count V)

Defendants move to dismiss the Section 1985(3) claim. Section 1985(3) provides:

> If two or more persons . . . conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . ., the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). For a Section 1985(3) claim a plaintiff must establish: "(1) a conspiracy; (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and

immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 642 (7th Cir. 2006). The Seventh Circuit indicated in *Munson v. Friske*, 754 F.2d 683 (7th Cir. 1985), that a Section 1985(3) claim is a class-based claim and that a plaintiff bringing a section 1985(3) claim should be required to prove an "invidious discriminatory motivation." *Id.* at 694; *see also Bowman v. City of Franklin*, 980 F.2d 1104, 1109 (7th Cir. 1992)(indicating that "the second element required some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action"); *See also Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002)(stating that for a Section 1985(3) claim "[t]he plaintiff also must show some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' actions, and that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment"). In the instant action, Snitzer has not alleged that the conspiracy formed against him was based on his race, his membership in a protected class, or was based on an invidious discriminatory motivation. Snitzer merely contends that the conspiracy was allegedly formed against him due to a personal dispute he had with Degnan and Dipiazza and was based upon the personal animosity that formed. Such allegations are not sufficient to raise the protections of Section 1985(3). Therefore, we grant Defendants' motion to dismiss the Section 1985(3) claim (Count V).

## IX.  RICO Claims (Counts VI and VII)

Defendants move to dismiss the RICO claims (Counts VI and VII).  A plaintiff bringing a RICO claim must establish that "he incurred an injury to his 'business or property' within the meaning of" 18 U.S.C. § 1964(c).  *Evans v. City of Chicago*, 434 F.3d 916, 925 (7th Cir. 2006).  The Seventh Circuit has stated that "'[t]he terms 'business or property' are, of course, words of limitation which preclude recovery for personal injuries and the pecuniary losses incurred therefrom.'"  *Id.* (quoting *Doe v. Roe,* 958 F.2d 763, 767 (7th Cir. 1992)).  In the instant action, Snitzer has alleged an injury to his personal reputation.  Such an injury would be the type of personal injury that would not fall within the meaning of the phrase "business or property."  Snitzer cites law from various Circuits other than the Seventh Circuit to support his contention that injuries to his personal reputation are injuries to his business or property.  (Ans. 25-26).  However, we agree with Defendants that, in light of the Seventh Circuit precedent addressing this issue, Snitzer's alleged injury to his reputation is not sufficient to support a RICO claim.  Therefore, we grant Defendants' motion to dismiss the RICO claims (Counts VI and VII).

## X.  Civil Conspiracy Claim (Count VIII)

Defendants move to dismiss the civil conspiracy claim.  For a civil conspiracy claim brought under Illinois law, a plaintiff must establish the following elements:

"(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004).

In the instant action, Snitzer does not provide any facts concerning an agreement between Degnan and Kaderbek. Snitzer claims that he had a disagreement with Degnan and Kaderbek subsequently took certain actions against Snitzer, but Snitzer has not provided sufficient facts surrounding the alleged conspiracy to suggest that there was an agreement formed in furtherance of an unlawful purpose. Snitzer must provide more than conclusory statements concerning a conspiracy between Degnan and Kaderbek. *See Concentra Health Servs.,* 2007 WL 2215764, at *2 (indicating in addition that the pleading requirement is not the same for all types of claims). Therefore, we grant Defendants' motion to dismiss the civil conspiracy claim (Count VIII).


**CONCLUSION**

Based on the foregoing analysis, we grant Defendants' motion to dismiss the First Amendment claim (Count I), the procedural due process claims brought against Degnan and Dipiazza (Count II), the substantive due process claim (Count III), the equal protection claims brought against Degnan and Dipiazza (Count IV), the Section 1985(3) claim (Count V), the claim alleging a violation of 42 U.S.C. §

1962(c) of RICO (Count VI), the claim alleging a violation of 42 U.S.C. § 1962(d) of

RICO (Count VII), and the civil conspiracy claim (Count VIII). We deny

Defendants' motion to dismiss the procedural due process claims brought against

Kaderbek and the City (Count II) and the equal protection claims brought against

Kaderbek and the City (Count IV).

Samuel Der-Yeghiayan
United States District Court Judge

Dated: August 15, 2007